IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

CELESTINE and ALLEN IRVING, HELENE and
JAMES SCHRANTZ, CONNIE HENLEY,
CALVIN and SANDRA MORRISON, JANE and
DENNIS EBERT, and SHARON and RICHARD
HATTON, individually and on behalf of all others
similarly situated,

          Plaintiffs,

v.

ORANGE LAKE RESORTS and HOLIDAY INN
CLUB VACATIONS,

Case No.:

JURY TRIAL DEMANDED

Serve defendant Holiday Inn Club Vacations at:

      Corporation Service Company

      221 Bolivar Street

      Jefferson City, MO 65101

And serve Defendant Orange Lake Resorts at:

      120 S. Central

      Clayton, MO 63105

          Defendants.

## PLAINTIFFS' CLASS ACTION COMPLAINT

COME NOW Plaintiffs, by and through undersigned counsel, and as representatives of a class of persons similarly situated, and for the Class Action Complaint against the Defendants named herein, state as follows:

## INTRODUCTION

This is a class action against a Florida Company alleging uniform and common material omissions in the sales presentation that it makes and has made to time share owners in multiple states in the USA, including Missouri, and involving resorts in multiple states in the USA, including Missouri. Silverleaf, Inc. was a time share company based out of Texas. In 2015, Silverleaf was acquired by Orange Lake Resorts, who also owns Holiday Inn Club Vacations, which it purchased in 2016, and operates today all of the resorts mentioned in this complaint.  Orange Lake Resorts, who dominates the vacation ownership industry, operates the Holiday Inn Club. The Holiday Inn Club Vacations brand was created in 2008 through a strategic alliance with IHG (InterContinental Hotels Group), one of the world's largest and wealthiest hotel companies.

Defendants use a high-pressure scheme that involves convincing prospective purchasers to buy into its vacation timeshare program while failing to adequately disclose material and legally required information to buyers.  Through this scheme, Defendants (a) fail to adequately provide legally required disclosures and (b) fail to provide purchasers with adequate access to their timeshares, as follows:

A.      Defendants fail to adequately provide customers with legally required disclosures. Specifically:

1.      Defendants failed to adequately train and supervise its sales agents, fails to provide them with disclosures to give to prospective customers, and encouraged them to lie to customers in the context of high-pressure sales pitches.

B.      Defendants failed to provide purchasers adequate access to their timeshares. Specifically:

1.      Defendants failed to adequately disclose to purchasers that their timeshare interest will be subject to a "floating use" plan.

2.      Defendants failed to adequately describe to purchasers the terms of the "floating use" plan.

3.      Defendants' "floating use" plan failed to provide purchasers reasonable access to their timeshares.

As a result of the common scheme, Defendants' owners are left paying thousands of dollars in purchase price, upgrade costs, and annual maintenance fees, all on timeshare units they are frequently unable to use as advertised, and rarely, if ever, are able to use as reasonably expected.

Defendants' aggressive business model relies on one essential premise: it makes money by selling shares in property units, not by customers using the weeks they have purchased in those units.  In fact, Defendants have a strong incentive to sell as many ownership shares as possible in a piece of property.  It can then further increase its profits by limiting owners' use of the units so they can be rented out by Defendants for additional profit or used by Defendants as sample units to sell timeshare properties to new buyers.  In this way, Defendants profit many times by selling and overselling various interests in one piece of property; it can sell it repeatedly at a premium, rent it repeatedly, and repeatedly use it as a tool to induce new sales—sometimes all at once.  Defendants uniformly fail to adequately

disclose material facts to buyers and, as a result, fail to deliver what buyers reasonably expect all in violation of Missouri common law and statutory law.

## JURISDICTION AND VENUE

1.      Subject matter jurisdiction is proper in this Court pursuant to **the Class Action Fairness Act, 28 U.S.C. § 1332(d). The federal Class Action Fairness Act (CAFA) provides for federal jurisdiction over a "class action." 28 U.S.C. § 1332(d)(1)(A).**

2.      Representative Plaintiffs seek to represent the following class under **Federal Rule of Civil Procedure 23(b)(3):** All persons who signed time share agreements with Holiday Inn Club Vacations (including corporations that have been purchased by Defendants) since October 1, 2010.

3.      Plaintiffs reserve the right to modify the Class definition as they obtain further information through discovery.

4.      The number of Class members is believed to be at least in the hundreds and may be in the thousands, making the Class so numerous that individual joinder of all Class members is impracticable.

5.      Plaintiffs are members of the proposed class.

6.      There are questions of law and fact common to Plaintiffs and to the proposed Class, including but not limited to the following:

       a.      Whether knowingly material misrepresentations and/or omissions were made to Class members at sales meetings.

       b.      Whether Defendants' actions have damaged Plaintiffs and other Class members.

c.      Whether Plaintiffs and Class members are entitled to cancel their timeshare agreements, and

d.      Whether Plaintiffs and Class members are entitled to declaratory, injunctive, and equitable relief to stop further acts.

7.      Plaintiffs' claims are typical of the claims of Class members

8.      Plaintiffs' interests do not conflict with those of Class members, and they will fairly and adequately protect the interests of Class members.

9.      Common questions of law and fact predominate over questions affecting only individual Class members, and a class action is superior to other methods for the fair and efficient adjudication of this controversy.

10.     The interest of Class members in individually controlling the prosecution of separate claims against Defendants is small due to the time and expense necessary to pursue individual litigation.  Management of these claims in a class action poses no significant impediments.

11.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief and corresponding declaratory relief with respect to the Class as a whole appropriate.

12.     Between Plaintiffs and Defendants there exists at least "minimal diversity" as "any member of a class of plaintiffs is a citizen of a State different from any defendant." §§ 1332(d)(2)(A).

13.     The aggregate amount in controversy as to all Plaintiffs' claims exceed $5 million. §§ 1332(d)(2).

14.     At least three Plaintiffs have claims that satisfy the $75,000 individual amount in controversy requirement **28 U.S.C. §§ 1332(a).**

15.     This Court has both general and specific personal jurisdiction over Defendants because Defendants have continuous and systematic general business contacts in this State. Defendants own, maintain, operate, collect payments, and/or derive revenue from the sale of property in this State, and had contact with this District specifically with respect to the events giving rise to Plaintiffs' and Class Members' claims.  Defendants have purposefully and voluntarily availed themselves of this Court's jurisdiction by engaging in and/or profiting from real property transactions in this State.

16.     This Court has both general and specific personal jurisdiction over Defendants, including under Missouri's Long Arm Statute, **V.A.M.S. § 506.500**, et seq., because Defendants have continuous and systematic general business contacts in Missouri. Defendants own, maintain, operate, collect payments, and/or derive revenue from the sale of property in Missouri, and had contact with Missouri specifically with respect to the events giving rise to Plaintiffs' and Class Members' claims. Defendants have purposefully and voluntarily availed themselves of this Court's jurisdiction by engaging in and/or profiting from real property transactions in Missouri.

17.     Venue is proper in this Court pursuant to **28 U.S.C. § 1391(a)** because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this State, and the property that is the subject of this action is situated in this State.  Defendants conduct substantial business in this State and District, has marketed, advertised, and sold timeshare properties in this State, and has caused harm to Class Members residing in this State and District.

18.     Any purported forum selection clause in the contract at issue in this case is invalid and unenforceable, to the extent that the contract at issue in this case, and/or each portion thereof,

resulted from misrepresentation, fraudulent inducement, duress, abuse of economic power, or other unconscionable means.  The forum-selection clause at issue here is a contract of adhesion that Plaintiffs and members of the proposed class had no opportunity to negotiate and requiring Plaintiffs and members of the class to litigate in Defendants' choice of forum would be unjust.

## PARTIES

**Plaintiffs:**

19.     Plaintiffs Allen and Celestine Irving are residents of St. Louis, Missouri.

20.     Plaintiffs Helene and James Schrantz are residents of Dundas, Minnesota.

21.     Plaintiff Connie Henley is a resident of Crete, Illinois.

22.     Plaintiffs Calvin and Sandra Morrison are residents of Charlotte, North Carolina.

23.     Plaintiffs Jane and Dennis Ebert are residents of Lowell, Arkansas.

24.     Plaintiffs Sharon and Richard Hatton are residents of Lakeview, Arkansas.

**Defendants:**

25.     Defendant Holiday Inn Resorts is a Florida Limited Liability company, whose principal place of business is 8505 W. Irlo Bronson Memorial Hwy, Kissimmee, FL 34747, and with a registered agent located at: Corporation Service Company, 221 Bolivar Street, Jefferson City, MO 65101

26.     Defendant Orange Lake Resorts is a Florida Limited Liability company, whose principal place of business is 9271 S. John Young Parkway, Orlando, FL 32819, with a registered agent located at 120 S. Central, Clayton, MO 63105

27.     John Doe is an unnamed Defendant at this time, who has worked for one of the afore-referenced Defendants.

28.     At all times herein mentioned, each of the Defendants was the agent, servant, partner, aider and abettor, co-conspirator and/or joint venture of each of the other Defendants and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their collective conduct constituted a breach of duty owed to Plaintiffs and injured Plaintiffs.

29.     At all times herein mentioned, Defendants and each of them, were fully informed of the actions of their agents and employees, and thereafter no officer, director or managing agent of Defendants repudiated those actions, which failure to repudiate constituted adoption and approval of said actions and all Defendants and each of them, thereby ratified those actions.

30.     There exists and, at all times herein mentioned, there existed a unity of interest in ownership between certain Defendants and other certain Defendants such that any individuality and separateness between the certain Defendants has ceased and these Defendants are the alter ego of the other certain Defendants and exerted control over those Defendants. Adherence to the fiction of the separate existence of these certain Defendants as entities distinct from other certain Defendants will permit an abuse of the corporate privilege and would sanction a fraud and/or would promote injustice.

## **FACTUAL ALLEGATIONS**

**The Timeshare Industry**

### **Repeated Sales of the Same Property Drive the U.S. Timeshare Industry**

31.     The U.S. timeshare industry was founded in the early 1970s, a period of economic stagnation and soaring energy costs, when hotel and resort developers struggled to sell full ownership condominium properties. Instead of selling an actual condominium, developers

realized, they could sell "ownership shares" to many customers, each of which theoretically gives an owner the right to use the property (or a similar property) for certain amounts of time per year.

32.     This simple notion—dividing one condominium or resort property into "ownership shares" and selling it over and over again, to dozens of different buyers—is the fundamental concept that has given rise to the profitable modern timeshare industry. By selling a vacation timeshare unit incrementally, a timeshare developer makes far more money than if it sold the same unit to one buyer for the market price.  As an illustration, a timeshare developer can build 150 condominiums, each of which might sell for $200,000 on the open market; using a timeshare approach, the developer could sell two-week timeshares in each unit, for a total of 26 "timeshares," for, say, $20,000 each.  By using the timeshare scheme, the developer's investment brings a return of $520,000—2.6 times greater than the $200,000 it would have grossed selling to one buyer. (Defendants takes this scheme several steps farther: it sells many more than 26 timeshares in each unit, exponentially increasing its profits while knowing that the unit will rarely or never be available for purchasers to use them.)

33.     Timeshare business is booming. According to the Association of Vacation Owners, the size of the annual timeshare market is $9.2 billion, with 9.2 million American households owning some form of timeshare.  In 2015, approximately 9.2 million American households owned timeshares.  There were 1,547 timeshare resorts in the United States, with approximately 200,720 units available to be divided up and sold repeatedly.  The timeshare industry sold $8.6 billion worth of timeshares to consumers in 2015, with an average sales price of $22,240 and average maintenance fees of $920. *See* Howard Nusbaum, "Local Perspective on the Global Timeshare Industry," September 21, 2016, *available at* http://www.rdoconference.org/wp-content/uploads/2016/09/a-global-perspective-howardnusbaum.pdf;     see     also     Gretchen

Morgenson, "The Timeshare Hard Sale Comes Roaring Back," *New York Times*, January 24, 2016, *available at* https://www.nytimes.com/2016/01/24/business/ diamond-resorts-accused-of-using-hard-sell-to-push-time-shares.html.

34.    The industry is currently experiencing a period of substantial growth.  Timeshare sales volume has increased by more than 33% since 2011, the industry reports, an average of 7% annually. In the most recent year for which data is available, sales volume rose from $8.6 billion 218 in 2015 to $9.2 billion in 2016, a nearly seven percent increase.  This is part of a seven-year growth trend: in 2015, sales volume increased by nearly 9%, the second-largest percentage increase since the housing market collapse of 2008 caused the Great Recession.

35.    These corporations loan money to consumers to finance the purchase.  They then convert the timeshare promissory notes into securities that are rated and sold in the financial markets.

36.    The timeshare industry's record profits are driven by sales of ownership shares, not its customers' use and enjoyment of their properties. In fact, a timeshare business makes money every time someone makes a down payment or monthly payment on a timeshare, including paying steep annual "maintenance fees," but when people use the properties, it prevents the timeshare developer from renting that property to another customer or using it to entice a prospective purchaser to buy a timeshare.  Selling units to new customers and selling nicer units to existing customers is the lifeblood of the timeshare industry.

37.    The timeshare business has been a breeding ground for fraudulent sales tactics like those employed by Defendants as detailed herein.  Since its founding in the early 1970's, the industry has relied on "sneaky come-ons" to trap consumers in "multi-hour presentations complete with high-pressure sales tactics."  Consumer Reports, "The Timeshare Comes of Age," Feb. 23,

2016, available at http://www.consumerreports.org/travel/the-timeshare-comes-of-age/. In recent years, lawsuits and news reports have documented "high pressure sales tactics involving deliberate lies and misrepresentations to get people to buy more timeshare 'points.'" New York Times, "My Soul Feels Taller: A Whistleblower's $20 Million Vindication," https://www.nytimes.com/2016/11/25/business/my-soul-feels-taller-a-whistle-blowers-million-vindication.html. Among the tactics used by one prominent timeshare business: "TAFT" days, where employees were encouraged to "Tell Them Any Frigging Thing" to make a sale, as long as they didn't put it in writing. *Id.*

**Defendants' Failure to Disclose Material Facts to Timeshare Purchasers**

38.     To effectuate its scheme detailed herein, Defendants uses high-pressure sales tactics to induce prospective purchasers to buy into its vacation timeshare program while failing to disclose material and legally required information to them.  Among other material omissions, Defendants' scheme includes the following elements:

a.      In Missouri, a timeshare estate is an interest in real property, and a timeshare use is a contractual right of exclusive occupancy. Timeshare sales and closing agents are licensed and /or regulated by the State.  As part of their scheme, Defendants fail to adequately train or to supervise their sales agents, and, in fact, encourage their sales agents to utilize high-pressure sales tactics which violate the Missouri Merchandising Practices Act, the Missouri Time-Sharing Regulation, and the common law.

b.      The Missouri Time-Sharing Regulation requires timeshare developers and sales agents to deliver various disclosures to timeshare purchasers.

c.      The Missouri Time-Share Regulation contemplates that purchasers of a timeshare should receive clear and accurate information about their purchase.  As part of their

scheme, the Defendants fail to adequately disclose to purchasers that they are not purchasing a share in a specific unit but are instead buying into a "floating use plan"; they fail to adequately disclose how the "floating use plan" actually works; and they fail to adequately disclose that the Defendants may delay delivery of a deed to the purchasers for a period of years;

        d.     As part of their Scheme, the Defendants fail to disclose to purchasers that because Defendants oversells and artificially restricts the availability of Resort properties (by, for example, renting the properties to non-owners, using the properties as model units, selling to purchasers when no units are available to be deeded, and closing units for maintenance), they will not be able to use their timeshare purchase as advertised or as would be reasonably expected – or sometimes at all – in violation of the Missouri Time-Sharing Regulation requirements that timeshare developers must disclose restrictions on use or occupancy, develop and use reasonable arrangements to manage the timeshare program, and avoid making misleading or deceptive representations about it.

39.    Defendants sales agents pressure purchasers to sign a series of complex and misleading legal documents without giving purchasers the opportunity to read—or in some cases, see—the documents they are signing (in some cases electronically).  Only months later, when the new timeshare owners attempt to reserve vacation time in "their" unit, do they learn that Defendants made knowingly false representations that Plaintiffs relied on when purchasing the time share.

### Defendants Uses High-Pressure Sales Tactics to Trick Consumers into Making Purchases They Do Not Understand

40.    To effectuate their scheme, Defendants agents approach vacationers on the street, in restaurants, and at other public areas.  They offer them free tickets to local attractions, discounts

on timeshare purchases, and vouchers for free meals in order to entice them to take a tour of the Resort.

41.     Once these vacationers arrive at the Resort for the tour, Defendants agents subject them to a high-pressure sales pitch—in some instances lasting as long as eight hours—designed to ensure that they do not leave without purchasing a timeshare property.  Defendants agents attempt to persuade prospective purchasers by telling them that a timeshare is cheaper than paying for future vacations, but that they must act immediately in order to take advantage of supposedly discounted prices.

42.     The high-pressure sales tactics do not stop once Defendants completes a sale: existing owners face constant pressure from Defendants agents and employees to upgrade to nicer units.  For example, Defendants assigns owners a "concierge," supposedly to assist them with booking and other transactions, but in fact the concierge is a sales person who pressures owners to "upgrade" their prior purchase—selling back their initial property and purchasing a nicer, larger, or deluxe property.

### Defendants Fails to Tell Owners That They Cannot Reasonably Use and Enjoy Their Property

43.     Defendants represent to prospective purchasers that as timeshare owners, they will have no difficulty using their timeshare unit whenever they want, provided they book with notice.

44.     In reality, Defendants fail to disclose that timeshare owners are routinely unable to book units in the Resort with as much as 12 months' notice.  Timeshare owners have made repeated attempts to book a stay during their allotted time, only to be told by Defendants' officials that there is no availability at the Resort.  As a result, many Class Members have been entirely unable to use their timeshare property for an entire year.

45.     Defendants specifically don't disclose to purchasers that tens of thousands people own timeshare properties at a single Resort, with some owners "owning" multiple "weeks," limiting each owner's ability to use and enjoy the timeshare property for which he or she paid.

46.     Likewise, Defendants do not disclose to purchasers that it sets aside a substantial number of units in the Resort as vacation rentals, further restricting the supply of units available for timeshare owners to use.  In other words, Defendants choose to rent units out—including the specific units it lists in deeds of sale to timeshare owners—instead of making them available to owners.  In some instances, as described more fully below, Defendants have told a timeshare owner that there is no availability in the unit type listed on his or her deed, but the owner then finds the same unit type listed on Defendants' website as a vacation rental, with proceeds going to Defendants.  Furthermore, Defendants do not inform purchasers that certain purchasers may not receive a deed, for a period of years, but will still be able to make reservations, thereby diluting the availability for existing owners.

47.     Finally, Defendants do not inform purchasers that it sets aside large numbers of demonstration units for the near-constant tours and sales efforts it uses to generate new timeshare business.  Because the profitability of Defendants' timeshare business largely depends on sales of new and upgraded units, the Resort devotes substantial resources to high-pressure sales tours, during which dozens to hundreds of prospective purchasers are brought each day through many of the nicest timeshare units at the Resort.  None of these units are available to the owners during these events who have legitimately paid for the right access to them.

### Defendants Fail to Adequately Inform Purchasers That They Are Not Purchasing a Share in a Specific Unit

48.     Defendants sales agents give purchasers the impression that they are purchasing the right to use a specific unit at the Resort.  In actuality, they are participating in Defendants'

"Floating Use Plan," which gives owners the right to use a certain type of unit, subject to availability. And units are rarely, if ever, available to "owners," as advertised or expected.

49.     The purchase documents Defendants drafts and requires purchasers to sign lead them to believe that they are purchasing a share in a specific unit in the property. For example, the Warranty Deeds drafted by Defendants and signed by Plaintiffs state that they have the "right to occupy, pursuant to the Plan," specific units at the Resort. However, in the fine print of Defendants' Floating Use Plan, purchasers relinquish their rights to possess and use specific units at the Resort. Defendants sales agents do not disclose this to purchasers during the high-pressure sales process.

50.     Defendants does not even give owners the right to use similar units at the Resort. Despite making repeated representations in the high-pressure sales pitches that owners can book their specific unit, or an identical one, for use anytime in the time period purchased, Defendants routinely prevents owners from booking the unit type. In this way, Defendants' "floating use" plan, which it does not adequately describe to timeshare purchasers, fails to provide purchasers reasonable access to their timeshares.

**<u>Because the Resort is Oversold, Defendants Fails to Deliver Deeds to Owners</u>**

51.     Defendants routinely fails to deliver warranty deeds to owners because it sells more timeshare properties than the fractional interests it possesses, leaving it without sufficient deeds to provide owners.

52.     When purchasers buy a timeshare property at the Resort, the warranty deed should be recorded by Defendants with the local County Register of Deeds. Recording the warranty deed protects purchasers from title claims by third parties, and conversely, the failure to properly record the warranty deed leaves purchasers vulnerable to such claims.

53.     Purchasers of timeshare properties at the Resorts had told that Defendants will record their Warranty Deed and send them a copy.  Nor do Defendants tell purchasers that in some cases, it has not recorded their deed.  As a result, purchasers reasonably believe that their property transaction will be duly recorded, and their real property interest is protected from claims by third parties.

54.     Defendants' routine failure to record warranty deeds further proves Defendants' pattern and practice of overselling the Resort: it cannot record and deliver deeds because it sells more fractional interests in real property than actually exist.  Defendants' attempt to remedy this failure with hidden contract language only demonstrates that Defendants is in the business of defrauding its customers.  However, Defendants have ceased this practice, and instead of providing purchasers with deeds, Defendants now provide purchasers with "points"

### Specific Allegations of Wrongful Conduct by
### Defendants as to Plaintiffs Allen and Celestine Irving

55.     Plaintiffs Allen and Celestine Irving reside in St. Louis, MO.

56.     Plaintiffs Irving Allen purchased a timeshare in Kissimmee, Florida at Orange Lake Resort from Defendants on September 8, 2014.

57.     Plaintiff was pressured to take the deal in a presentation that lasted over 4 hours at several different conference rooms at the Orange Lake Resort with several different sales agents of Defendants.

58.     After the exhaustive sales pitches of Defendants' agents, Plaintiffs Irving and Celestine Irving executed a contract with Defendants' "Quality Assurance Officer" named "Kathleen M. _____ (last name on spelled in contract and is illegible, appears to be "Joulle")

59.     Plaintiffs were worn down by the sales team through being sent from one sales

agent to another. Plaintiffs were told that this was a "today only" price and that he could not leave and think about this purchase before making it.

60.     Defendant's agents told Irving that he could rent the timeshare out for a profit, that the timeshare was a good investment, and that he needed to upgrade to use his timeshares as points through Defendants' "point system."

61.     Plaintiffs detrimentally relied on Defendants' knowingly false statements when the entered the time share contract with Defendants.

62.     Plaintiffs were later told by Defendants that he could not rent out his timeshare interest, even to family.

63.     Plaintiff was misled by the Defendants' agents that he was purchasing property that could be rented out to pay for his maintenance fees and that buying his second property would allow for him to convert his timeshares into points to be used for hotel stays.

64.     Plaintiff later learned that all the foregoing representations made by the Defendants' agents were false. Plaintiff was misled as he did not believe that he would was purchasing a property that would be a burden to his family members and heirs. Plaintiffs believed that he would be able to easily exit the timeshare without issue.  They were never able to rent out their property and no agent of Defendants assisted them.

65.     Defendants' agents falsely claimed that the Plaintiffs' maintenance fees would not increase in any significant way, if at all.

66.     Plaintiffs detrimentally relied on these knowingly false statements made by Defendants.

67.     In fact, Plaintiff's maintenance fees increased substantially each year and have almost doubled, as of 2020.

68.     Plaintiffs would not have purchased the time share interest at issue, but for Defendants'' knowingly false misrepresentations.

**<u>Specific Allegations of Wrongful Conduct by</u>**
**<u>Defendants as to Plaintiff Connie Henley</u>**

69.     Plaintiff resides in Illinois.

70.     Plaintiff Connie Henley is an owner at Defendant's resort who purchased two timeshares, one in Missouri and one in Illinois.

71.     In 2018, Plaintiff was pressured into buying points for a second timeshare after Holiday Inn took over the Silverleaf operated timeshare. Plaintiff was told that her ability to use benefits that she had used in the past were no longer available when the timeshare was purchased by Holiday Inn.

72.     Plaintiff was told that they were about to attend an "Owners" meeting that ended up being another high-pressure sales pitch. Plaintiff was pressured through a presentation that was supposed to be 90 minutes but lasted for hours.

73.     Plaintiff was told that they had to purchase the property "today and today only." Plaintiff was told that they had to purchase the second timeshare to convert their timeshare into points and that they would be able to take cruises with the points they received.

74.     Plaintiff was misled by the misrepresentations of the sales manager. Plaintiff has not been able to take the cruise that she was told she would be able to. Plaintiff feels rushed and unable to truly look over her documents. Plaintiff wanted to consult an attorney when given the contract by Holiday Inn and was unable to do so due to the high-pressured sale.

75.     Plaintiff has had both financial and medical hardships since the high-pressure sale of the second timeshare. Plaintiff has reduced income and has had multiple hip and knee replacements since.

## Specific Allegations of Wrongful Conduct by
## Defendants as to Plaintiffs Helene and James Schrantz

76.     Plaintiffs reside in Minnesota.

77.     Plaintiffs had been long time timeshare owners but were convinced to change to "Signature Points" in 2015 while vacationing in Branson, Missouri.

78.     This change to "Signature Points" were incredibly expensive for the Plaintiffs and Plaintiffs complained to the company in 2019.

79.     Defendant's agent Taylor Frommelt told the Plaintiffs that they would be unable to get out of the "Signature Points" program without having to sign another contract. Plaintiffs felt that they had to sign a new contract or else they would be further burdened under the "Signature Points" program.

80.     Plaintiffs were misled and misrepresented as they were pressured into signing yet another contract to alleviate their financial burdens to Defendants. Plaintiffs ended up spending more money to try and rid themselves of the obligation they had with the "Signature Points" program.

81.     Plaintiffs are both in their 80s and have health and mobility problems which limit their abilities to move, walk and travel.

## Specific Allegations of Wrongful Conduct by
## Defendants as to Plaintiffs Calvin and Sandra Morrison

82.     Plaintiffs Calvin and Sandra Morrison reside in North Carolina.

83.     Plaintiffs purchased 150,000 points at Defendant's Ozark Mountain Resort in Kimberling City, Missouri. Plaintiffs bought their timeshare points in October 2019.

84.     Defendants' falsely stated that Plaintiffs could use their point at any resort, and Plaintiffs believed that they were purchasing points they could use at a Florida resort.

85.     Plaintiffs only learned that their points were tied to the Missouri resort after receiving their documents from Defendants.

86.     Plaintiff felt coerced and pressured into making a purchase. The presentation was said to only take a short while but ended up being an all-day ordeal.

87.     Plaintiffs were shown a nice suite in their presentation but were unable to stay in those units because they were not in their "points level."

88.     Plaintiffs have multiple medical issues and Calvin Morrison is a veteran. Plaintiff Sandra Morrison has early onset of dementia as well.

### Specific Allegations of Wrongful Conduct by Defendants as to Plaintiffs Jane and Dennis Ebert

89.     Plaintiffs reside in Arkansas.

90.     Jane and Dennis Ebert have owned a timeshare in Branson, MO since March 1999. The Plaintiffs have used their timeshare less than 25 times and have not used it for the past 10 years.

91.     Plaintiffs were under the impression that they owned their week of the timeshare and that they were buying an investment that would increase in value.

92.     Plaintiffs were told that a timeshare is cheaper than paying for future vacations. Plaintiffs were told that they could rent their timeshare out to others for a profit. These promises never came to fruition.

93.     Plaintiffs' maintenance fees have increased substantially to the point that they would not have bought it if they knew that it would increase that much.

94.     Plaintiffs were given another high-pressure sales pitch after being told that they would be attending an "Owners" meeting.

95.     Plaintiffs were told that they had to purchase the property "today and today only." The Plaintiffs felt pressured and coerced to decided right away, if not they would not get the "today only price."

96.     Plaintiffs have medical expenses including a recent surgery for bladder cancer and back problems. Plaintiffs are unable to travel now.

### Specific Allegations of Wrongful Conduct by Defendants as to Plaintiff Sharon and Richard Hatton

97.     Plaintiffs reside in Arkansas.

98.     Sharon and Richard Hatton have been long time customers and owners of a Silverleaf resort in Branson, Missouri. They have had this timeshare since 1997.

99.     Plaintiffs, after being approached by Defendants' agents, Jacob Moore, Stephanie Hopewell, Agent #59654, and Russell Beach, Agent #59653, agreed to upgrade to the "points system" on June 23, 2017 at the Branson resort timeshare.

100.     Defendants' agents told the Hattons the following: they could rent the timeshare out for a profit; maintenance fees would only increase slightly, if at all; and, ownership was much cheaper than taking an independent vacation to the resort.

101.     The Hattons felt pressured to take the deal in a presentation that lasted several hours.  Defendants' agents told them that their purchase was a special deal that was only available that day.

102.     The Hattons were misled by the sales agents because Defendants' agents told them that they were purchasing real property that could be sold later.

103.     The Hattons later learned all the foregoing representations made by the Defendants' agents were false.  They were never able to rent out their property and no agent of Defendants was available to assist them.  Maintenance fees increased substantially each year. The Hattons have

learned it is actually cheaper to book stays at the resort from other online booking websites. The Hattons have had situations where they have tried to use their timeshare and were told it was booked and then called the resort which said they had rooms available at the same place at the same time.

104.    In or around early June 2018, Plaintiffs had a reservation with the Branson timeshare.  Due to a tornado striking Branson, their room were unavailable.  Instead of finding Plaintiffs lodging elsewhere, or otherwise being of service to them, Defendants simply cancelled the reservation at the Branson resort.

<u>**GENERAL ALLEGATIONS COMMON TO PLAINTIFFS**</u>

105.    All Plaintiffs attended Defendants sales presentations where they either bought a new timeshare membership or upgraded their existing Defendants timeshare membership.

106.    Plaintiffs subsequently learned the representations made by the Defendants agents were false. Plaintiffs now feel lied to and misled.

107.    As part of the various sales presentations, Plaintiffs are taken on a tour. Plaintiffs were shown a luxury suite which was represented by Defendants agents as what they were purchasing, but that later learned was not available at their level of ownership.

108.    Defendants agents told Plaintiffs that they would always get to stay at their first choice of property, that making reservations would never be a problem, and they could travel to any part of the world.

109.    Defendants agents would assure Plaintiffs that they could easily vacation anywhere in the world by signing up them up though the RCI or Interval International exchange programs. However, the Defendants agents never disclosed to Plaintiffs that they would have to pay an additional membership fee to take advantage of the exchange programs.

110.   Plaintiffs are often not able to use the property they thought they were purchasing.

111.   Plaintiffs have found that making reservations is difficult every time with many issues that arise each time, with a reservation process that is confusing and inconsistent.

112.   Defendants agents will often tell Plaintiffs that they cannot make a reservation at the property they purchased because it is always full, or that it is not possible to stay in those rooms because of the type of contract they currently have.

113.   Upon arriving at the resort, Plaintiffs often discover they had been assigned a different room than the one they believed they "owned." The room they were assigned to was one of noticeably lesser quality.

114.   When Plaintiffs complain, Defendants agent informed them that their room and all others were booked.

115.   Plaintiffs feel lied to because the Defendants agents they had purchased the ownership from told them they had the right to use the timeshare they paid for and that they would always be assigned to their purchased unit.

116.   If Plaintiff complain regarding their treatment, Defendants agents would offer to upgrade to their status, but only if they paid additional money to join Interval International or the RCI exchange program.

117.   Additionally, every time Plaintiffs have been able to reserve and utilize their timeshare, Defendants agents have told them that they were required to go to an owner update meeting. The Defendants agents explain that they had to attend the owners update meeting because, as an owner, it was their duty to be informed about the latest changes. However, all the owners meeting they have attended have turned out to be another sales presentation.

118.    On many occasions where Plaintiffs were able to utilize reservations, they found the rooms dirty, there was no housekeeping service available, bug infested, and had to clean the room themselves.

119.    Plaintiffs found the room they were able to stay at was below the standards of what was represented to them at the sales presentation and they learned they could not get a better room unless they upgraded rooms each year.

120.    Regarding the Plaintiffs who were upsold, Defendants agents informed them that such presentations are "mandatory" owners' meetings.

121.    At the upsell meetings, Plaintiffs are often told that they must upgrade right away because their building was scheduled for maintenance and they would not be able to use it until it was finished. Plaintiffs felt that the only choice to save their investment was by signing the upgrade.

122.    As part of the upsell presentations, Defendants agents would often inform those Plaintiffs that something was purportedly "wrong" with their contracts and convince them to sign an even more onerous contract that they would be obligated to.

123.    Defendants agents told Plaintiffs their family members and friends could use the timeshare for free during their purchased week.

124.    Instead, Plaintiffs had to pay additional fees to let family and friends use their membership.

125.    Defendants agents told Plaintiffs they were purchasing real property that could be sold later.

126.    Plaintiffs reasonably believed the deed that was recorded was evidence that they had purchased an interest in real property.

127.    Defendants agents told Plaintiffs they would be able to rent their timeshare out for a profit, making more than enough to pay for both their maintenance fees and mortgage payments. The Defendants agent promised Plaintiffs that Defendants has a special department ready to help them rent their timeshare. The Defendants agent assured them that the process of renting was a very simple procedure.

128.    However, Plaintiffs later found out that Defendants will not help them rent their timeshare and no Defendants agent is available to assist them.

129.    Defendants agents told Plaintiffs that maintenance fees were fixed, would never increase, or only increase slightly, if at all.

130.    Plaintiffs' maintenance fees have increased substantially over the last three years.

131.    Defendants agents told Plaintiffs that ownership was much cheaper than taking an independent vacation to the resort.

132.    It is cheaper for Plaintiffs to book stays at the resorts from other online booking websites.

133.    Defendants agents told Plaintiffs that their timeshare purchase was an investment that would increase in value over time.

134.    Contrary to the value of the property increasing, Plaintiffs were forced to upgrade to maintain their level of reservations because their ownership had devalued.

135.    Increase, instead of the value increasing, similar properties resell on eBay for $1.

136.    Plaintiffs felt pressured to take the deal in a presentation that lasted several hours.

137.    Plaintiffs were not offered any food during their time at the presentation

138.    To increase the pressure at the sales presentation, Plaintiffs are alternatively confronted by three Defendants agents.

139.    If a prospective sale refuses to buy, the Defendants agents began getting visibly angry and raising their voices.

140.    Defendants agents told Plaintiffs that their purchase was a special deal that was only available that day. Plaintiffs were told that if they bought the Defendants timeshare that day, they would get a discounted price.

141.    Plaintiffs were told that being a Defendants timeshare property owner entitled them to benefits and access which was limited exclusively to Defendants timeshare owners only.

142.    Defendants agents offered Plaintiffs free gifts, such as a "free" week in Orlando, Florida, or a "free" cruise, but were never actually given the gift of found later there was an additional cost to claim the gift that they would have to pay themselves.

143.    Defendants agents told the Plaintiffs that they could always later sell the timeshare later and that Defendants had buyers waiting.

144.    Defendants agents told the Plaintiffs that if they wanted to sell, they should go back to Defendants who would give them the best deal.

145.    Additionally, Plaintiffs have been charged Special Assessments for remodeling units they do not even own.

146.    If Plaintiffs explained that they could not afford to purchase the timeshare, Defendants agents would tell Plaintiffs they could not leave until they spoke with the manager. After waiting for an extended period of time, the manager would arrive "find a way" for them to afford the purchase.

147.    When Plaintiffs were unable to meet normal lending criteria, Defendants agents would devise special payment arrangements so Plaintiffs would still sign the contract to purchase the timeshare.

148.    Defendants agents at the purchase told them they could refinance the timeshare at a lower rate later, but ty later learned that banks will not refinance timeshares. Agents at the Defendants resort later told them that they are not responsible for what the Mitchells were told in the sales presentation.

149.    Plaintiffs are not reasonably given any information about the recission period, exiting the time share, or that there was a statutorily required grace period for getting out.

150.    In cases where Defendants agents did tell Plaintiffs that they had a legal right to rescind or cancel their purchase within three days, Defendants agents refused to explain how to execute the same.

## STATUTES OF LIMITATION, FRAUDULENT CONCEALMENT, AND ESTOPPEL
### Discovery Rule

151.    The causes of action did not accrue until Plaintiffs discovered, or could have discovered with reasonable diligence, the facts omitted and/or concealed by Defendants. Plaintiffs had no realistic ability to discern the true nature and value of their timeshare property purchases because Defendants' subsequent actions and omissions defined Plaintiffs' ability to use and enjoy their properties.

### Fraudulent Concealment

152.    Any applicable statutes of limitation have been tolled by Defendants' knowing, active, and ongoing concealment and denial of the material facts as alleged herein.  Defendants is a sophisticated party with superior knowledge of complex real estate and business transactions. Defendants was and is under a continuous duty to disclose to Plaintiffs the material facts alleged herein, and Plaintiffs reasonably relied on Defendants' knowing, affirmative, and ongoing concealment.

153.    Plaintiffs have been kept ignorant by Defendants of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.

**Estoppel**

154.    Defendants was and is under a continuous duty to disclose to Plaintiffs the true character, quality, and nature of the timeshare properties and transactions as alleged herein.  That concealment is ongoing.  Plaintiffs reasonably relied on Defendants' knowing failure to disclose and/or active concealment of those facts.  Defendants is estopped from relying on any statutes of limitation in defense of this action.  Additionally, Defendants is estopped from raising any defense of laches due to its own conduct as alleged herein.

155.    Plaintiffs make the following specific fraud allegations with as much specificity as possible, although they do not have access to information necessarily available only to Defendants:

a.    Who: Defendants, including each of the alter ego Defendants identified in this Complaint, and their agents, servants, and employees utilized a scheme to encourage the active concealment of legally required disclosures (including but not limited to the fact that Plaintiffs had a right to rescind the purchase) and other material facts about the timeshare transactions from Plaintiffs while simultaneously representing that Plaintiffs could use and enjoy their timeshare units whenever they wished, as alleged above.  Plaintiffs are unaware of, and therefore unable to identify, all the names and identities of those specific individuals at Defendants responsible for such decisions.

b.    What: Defendants knows but fails to adequately disclose to purchasers that: they are not purchasing a share in a specific unit but are instead buying into a "floating use plan," in which each timeshare owner's fractional interest is diluted many times more than if that person purchased the right to use a particular unit; because Defendants artificially restricts the availability

of Resort properties, they will not be able to use an expected Resort property when desired, rendering the "floating use plan" inadequate in violation of Missouri Time-Sharing Regulation, **Mo. Ann. Stat. § 407.625.**

c.      When: Defendants has not adequately disclosed the truth about the true nature and availability of timeshare properties at the Resort, nor purchasers' legal rights including the right to rescind the transaction and receive a warranty deed, to anyone outside of Defendants. Defendants has never taken any action to inform consumers about the true nature and availability of the timeshare properties at the Resort, or purchasers' rights with respect to the transactions. And when consumers complained to Defendants about the unavailability of properties, Defendants denied any knowledge of or responsibility for the problem, in many cases attempting to sell purchasers new or upgraded timeshare properties.

d.      Where: Defendants concealed material information regarding the true nature and availability of the timeshare properties, and purchasers' rights in the transaction, in its communications with Plaintiffs and made contrary representations about the nature and availability of the timeshare properties.  Plaintiffs are aware of no document, communication, or other place or thing, in which Defendants adequately disclosed the truth about the lack of availability of timeshare properties to anyone outside of Defendants.  Even where certain legal disclosures were included in the fine print of a sales contract or other purchase document, the documents themselves were often concealed from Plaintiffs by commission-based sales and closing agents through the use of a folio containing a secret pocket and the other high-pressure sales tactics described herein, including statements from licensed sales agents which materially contradict the disclosure.

e.      How: Defendants concealed material information regarding the true nature and availability of the timeshare properties, and purchasers' rights in the transaction, at all times,

even though it knew about the lack of availability of timeshare properties due to Defendants' artificial restriction of them, and about the legally required disclosures (including the right to rescind), and knew that this information would be important to a reasonable consumer. Defendants concealed this information by using high-pressure sales tactics, commission-based sales agents, and burying important consumer protection sections deep within a 15 page contract. The purchasers are instructed to just sign the last page, as opposed to the more common and ethical promise of having purchasers at least initial each page of their timeshare contracts.

f.    Why: Defendants actively concealed material information about the timeshare transactions, the legally inadequate floating use plan, the purchasers' ability to use and enjoy their purchase, and each purchaser's right to rescind the transaction for the purpose of inducing Plaintiffs to purchase timeshare properties and, once they owned timeshare properties, to purchase additional timeshare properties and services from Defendants. Had Defendants disclosed the truth, for example in its sales pitches, advertisements, or other materials or communications, Plaintiffs (and reasonable consumers) would have been aware of it, and would not have bought timeshare properties (including by exercising their right to rescind their purchase contracts), or would have paid less for them.

## FORCE AND EFFECT OF CONTRACTS

156.   Defendants' contracts with purchasers are either void ab initio or voidable and should be rescinded and avoided.

157.   Defendants' contracts with purchasers are void ab initio because they are premised upon a fraud, as more fully detailed herein.

158.   Defendants' contracts with purchasers should be rescinded and avoided because they violate statutes enacted for the protection of the public interests and specifically for the

protection of timeshare purchasers, including but not limited to the **Missouri Merchandising Practices Act, Mo. Code Ann. §  407.010**, et seq., the **Missouri Time-Sharing Regulation, Mo. Ann. Stat. § 407.600**, et seq..

159.    Defendants' contracts with purchasers should be rescinded and avoided because they are based on fraudulent omissions including the failure to disclose to purchasers, inter alia, that they are not purchasing a share in a specific unit, that Defendants oversells the Resort, that purchasers cannot reasonably reserve and use their timeshare unit, and that purchasers have a statutory right to rescind the contract, all as more fully detailed herein.

160.    Defendants' bargaining power is far superior to that of purchasers, and it enters into timeshare contracts by unconscionable means, including under circumstances where Defendants has undue influence over purchasers, and/or circumstances that constitute duress and/or an abuse of economic power, as more fully detailed herein.  For all these reasons, Defendants' contracts with purchasers should be rescinded and avoided.

### COUNT I-VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT AND MISSOURI TIME-SHARING REGULATION
**(Against all Defendants)**

161.    Plaintiffs hereby re-allege and incorporate by reference verbatim all of the previous allegations of this Complaint as if the same were fully set forth herein.

162.    At all relevant times there was in effect Missouri Merchandising Practices Act, **Mo. Code Ann. § 407.010**, et seq., the Missouri Time-Sharing Regulation, Mo. Ann. Stat**. § 407.600**, et seq..

163.    **Section 407.630.1 of the Missouri Time-Sharing Regulation** provides, in pertinent part,  A time-share plan or time-share property is merchandise under the provisions of this chapter and the sale or offering for sale of such plans or property shall be subject to the

provisions of sections 407.010 to 407.140, unless otherwise specifically provided in sections 407.600 to 407.630.

164.    **Section 407.025.1 of the M.M.P.A** provides, in pertinent part: ***"The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…in…the state of Missouri, is declared to be an unlawful practice."***

165.    Defendants constitutes "persons," as defined by Section 407.010(5) of the Act, and as referenced in Section 407.025.1 of the Act.

166.    Defendants have sold and/or financed "merchandise" in "trade" or "commerce" in the State of Missouri, as those terms are defined by **Section 407.010** of the Act. Specifically, Defendants have sold and/or leased timeshares, a type of merchandise under the Act, in their trade and commerce in the State of Missouri.

167.    In selling and financing timeshares in the State of Missouri, Defendants have used or employed deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of material facts relating to its merchandise, all in violation of the Act. Specifically, Defendants have engaged in unlawful practices in one or more of the following ways:

a.    Concealing, suppressing, and/or omitting material facts about the nature of the timeshare purchase transaction.

b.    Violating the duty of good faith in negotiating in solicitation, negotiation, and performance in connection with the advertisement or sale of merchandise in violation of **15 C.S.R. 60-8.040.**

      c.      Advertising, marketing, and/or promoting Time-share interests for sale to Plaintiffs and the Class as a legally adequate timesharing plan.

      d.      Providing or assisting in obtaining financing through predatory lending to facilitate the purchase of timeshares to Plaintiffs and The Class; and

      f.      Other actions which will be further discovered.

168.    Defendants knew at the time the timeshare interests were sold to the Plaintiffs and the Class that the ability to use and enjoy the timeshare properties was limited by Defendants policies and procedures.

169.    **Section 407.025.1 of the Act** further provides, in pertinent part:

*"Any person who purchases…merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money…as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020, may bring a private civil action in either the circuit court of the county in which the seller…resides or in which the transaction complained of took place, to recover actual damages. The court may, in its discretion, award punitive damages and may award to the prevailing party attorney's fees…and may provide such equitable relief as it deems necessary and proper."*

170.    At all relevant times, Plaintiffs purchased the timeshares at issue for "personal family or household purposes."

171.    Defendants intended that Plaintiffs and other members of the Class detrimentally relied on their misrepresentations and omissions.

172.    As a proximate result of Defendants' misrepresentations, omissions and unlawful practices, and the Plaintiffs' detrimental reliance thereon, Plaintiff and other members of the Class suffered an ascertainable loss of money by paying, and financing, the purchase price of a timeshare

As such, Plaintiffs and other members of the Class are entitled to bring this action to recover, inter alia, their actual damages, punitive damages, and attorneys' fees available under the Act.

173.    At all times herein, Defendants intentionally engaged in the unlawful practices enumerated above. Further, Defendants acted in reckless or conscious disregard of the interests of Plaintiffs and other Class members, perpetrating their unlawful practices in a willful, wanton, and malicious manner, such that an imposition of punitive damages is warranted.

### COUNT II-UNJUST ENRICHMENT
**(Against all Defendants)**

174.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

175.    Plaintiffs conferred benefits upon Orange Lake Resorts in the form of down payments, monthly mortgage payments, recurring maintenance fee payments, and additional fee and membership payments for property at the Resort and membership in Orange Lakes Resorts' timeshare and other programs.

a.    Those payments were made with the reasonable expectation that Defendants were selling timeshare properties that could be used and enjoyed by Plaintiffs as represented by Defendants' agents, and that Defendants were complying with the Missouri Merchandising Practices Act, The Missouri Time-Sharing Regulation.

b.    It would be unjust to permit Defendants to keep the payments made by Plaintiffs because Defendants induced Plaintiffs to make those payments by failing to disclose the facts material to the transactions.

c.    Plaintiffs, on behalf of themselves and the proposed Class, seek restitution.

## COUNT III-FRAUDULENT MISREPRESENTATION BY OMISSION
### (Against all Defendants)

176.    Plaintiffs repeat and incorporate by reference each of the foregoing allegation of this Complaint.

177.    Defendants engaged in a high-pressure sales pitch designed to induce Plaintiffs to make a significant financial decision in a short time span with inaccurate information.

a.    Defendants represented to the Plaintiffs that as timeshare owners, they would have no difficulty using their timeshare and would have ample access to reservations.

b.    Defendants were required to disclose to each party to the transaction any adverse facts of which they had actual notice or knowledge, and timely and accurate information regarding market conditions that might affect the transaction; and they were required to provide services to each party to the transaction with honesty and good faith.

c.    Defendants utilized a scheme to confuse consumers regarding their rights and avoid making required disclosures of material fact while selling the timeshares to Plaintiffs.

d.    In carrying out the above-described scheme and failing to make the above described disclosures and/or intentionally avoiding them so that the Plaintiffs would not see them, the Defendants fraudulently omitted material information, fraudulently induced the Plaintiffs to remain in the contract through the rescission period, and generally defrauded the Plaintiffs.

e.    Defendants' intended for the Plaintiffs to rely on its representations of material fact when the Plaintiffs purchased timeshare interests, and Plaintiffs did indeed rely on its representations.

178.    Defendants knew, or should have known, that they were omitting and failing to make certain required disclosures.  The omissions described herein were material in nature and were made to induce the Plaintiffs to enter a contract and purchase a time-share interest.  Plaintiffs

reasonably and justifiably relied upon Defendants' representations that omitted material facts in deciding to purchase the time-share interests.   Defendants knew of the falsity of the representations, or had utter disregard for their truth, when they were made.  Defendants intended to induce reliance upon the representations.   Plaintiffs were entitled to rely upon the representations, since the representations concerned complex matters of Holiday Inn programs and real estate law.  Plaintiffs' reliance was reasonable under the circumstances.

179.    Plaintiffs were injured and damaged by virtue of their reasonable reliance on these representations containing omissions.  Had Plaintiffs known the truth, they would not have purchased the timeshares.

180.    Defendants' omissions were intentionally made for the purpose of inducing the Plaintiffs to enter a contract, close the sale, and remain in the contract without knowing about their rescission rights.  Defendants sales agents work on commission and received commissions from the sale to the Plaintiffs.  In the alternative, if the Defendants' omissions were not intentional, they were grossly negligent, as the Defendants knew or should have known the truth regarding Defendants, its policies, and its procedures.

181.    At all times relevant, the sales agents and other individuals described herein were acting as agents of Defendants, and their actions, which were performed in the scope of their employment with Defendants, are attributable to Defendants pursuant to the doctrine of respondent superior.

182.    For all the reasons set forth herein, the Plaintiffs were induced to purchase a time-share interest from Defendants by fraud.  The omissions of material fact, combined with the high-pressure sales pitch, and the confusing nature of the written documents between the parties were

all part of a scheme devised to induce the Plaintiffs to buy a time-share from Defendants at substantial cost to the Plaintiffs without complying with Missouri law.

183.     The sale, and any contract between the parties, should be rescinded, with all sums paid returned to the Plaintiffs and with the time-share interest returned to Defendants.  In addition, the Plaintiffs should recover all damages and other relief to which they are entitled, including punitive damages, which are warranted for the intentional deceptive, unfair, and fraudulent conduct of the Defendants.

### COUNT IV-FRAUD IN THE INDUCEMENT
#### (Against all Defendants)

184.     Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

185.     Defendants engaged in a high-pressure sales pitch designed to induce the Plaintiffs to make a significant financial decision in a short time span with inaccurate information.

186.     Defendants had an affirmative duty under **Missouri Merchandising Practices Act, Mo. Code Ann. § 407.010, et seq., the Missouri Time-Sharing Regulation, Mo. Ann. Stat. § 407.600, et seq. herein**.  Defendants were required to fully and accurately disclose factual information about the property and the purchaser's rights with respect thereto, including but not limited to: the type and number of units, a budget and information regarding fees that will be charged, specific language informing the purchaser of his, her, or their right to rescind the agreement, and a public offering statement, which if not received by the purchaser renders the contract voidable.

187.     The Defendants were required to disclose to each party to the transaction any adverse facts of which they had actual notice or knowledge, and timely and accurate information

regarding market conditions that might affect the transaction; and they were required to provide services to each party to the transaction with honesty and good faith.

188.   By utilizing a scheme to avoid making the above-described disclosures and/or intentionally hiding them so that the Plaintiffs would not see them, the Defendants fraudulently omitted material information, fraudulently induced the Plaintiffs to remain in the contract through the rescission period, and generally defrauded the Plaintiffs.

189.   Defendants knew, or should have known, that they were omitting and failing to make required disclosures.  The omissions described herein were material in nature and were made to induce the Plaintiffs to enter a contract and purchase a time-share interest.  Plaintiffs reasonably and justifiably relied upon Defendants' representations that omitted material facts in deciding to purchase the time-share interests.  Defendants knew of the falsity of the representations, or had utter disregard for their truth, when they were made.  Defendants intended to induce reliance upon the representations.   Plaintiffs were entitled to rely upon the representations, since the representations concerned complex matters of Defendants' programs and real estate law. Plaintiffs' reliance was reasonable under the circumstances.

190.   Plaintiffs were injured and damaged by virtue of their reliance on these representations containing omissions.   Had Plaintiffs known the truth, they would not have purchased the time-shares.

191.   Defendants' omissions were intentionally made for the purpose of inducing the Plaintiffs to enter a contract, close the sale, and remain in the contract without knowing about their rescission rights.  Defendants' sales agent work on commission and received commissions from the sale to the Plaintiffs.  In the alternative, if the Defendants' omissions were not intentional, they

were grossly negligent, as the Defendants knew or should have known the truth regarding Defendants, its policies, and its procedures.

192.    At all times relevant, the sales agents and other individuals described herein were acting as agents of Defendants, and their actions, which were performed in the scope of their employment with Defendants are attributable to Defendants pursuant to the doctrine of respondent superior.

193.    For all of the reasons set forth herein, the Plaintiffs were induced to purchase a time-share interest from Defendants by fraud.  The omissions of material fact, combined with the high-pressure sales pitch, and the confusing nature of the written documents between the parties were all part of a scheme devised to induce the Plaintiffs to buy a time-share from Defendants at substantial cost to the Plaintiffs without complying with Missouri law.

194.    The sale, and any contract between the parties, should be rescinded, with all sums paid returned to the Plaintiffs and with the time-share interest returned to Defendants.  In addition, the Plaintiffs should recover all damages and other relief to which they are entitled, including punitive damages, which are warranted for the intentional deceptive, unfair, and fraudulent conduct of the Defendants.

### COUNT V-NEGLIGENT MISREPRESENTATION BY OMISSION
**(Against All Defendants)**

195.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

196.    Defendants' sales agents are governed by the Missouri Merchandising Practices Act, the Missouri Time-Sharing Regulation.

197.    **Section 407.025.1 of the M.M.P.A** provides, in pertinent part: ***"The act, use or employment by any person of any deception, fraud, false pretense, false promise,***

*misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…in…the state of Missouri, is declared to be an unlawful practice."*

198.    **The Missouri Time-Sharing Regulation, Mo. Ann. Stat. § 407.625**, requires the timeshare professional, prior to the execution of any contract between the purchaser and the timeshare developer, to deliver to the purchaser certain information, and the purchaser shall certify, in writing, to the receipt of such written information. As relevant to this lawsuit, the required information includes:

a.    A complete and accurate description of all limitations, restrictions, or priorities employed in the operation of the exchange program, including, but not limited to, limitations on exchanges based on seasonality, unit size, or levels of occupancy, expressed in boldfaced type, and, in the event that such limitations, restrictions, or priorities are not uniformly applied by the exchange program, a clear description of the manner in which they are applied;

b.    The number of units in each property participating in the exchange program which are available for occupancy and which qualify for participation in the exchange program, expressed within the following numerical groupings: 1-5, 6-10, 11-20, 21-50, and 51 and over; and;

c.    The number of owners with respect to each time-share plan or other property which are eligible to participate in the exchange program expressed within the following numerical groupings: 1-100, 101-249, 250-499, 500-999, and 1,000 and over; and a statement of the criteria used to determine those owners who are currently eligible to participate in the exchange programs.

199.    Defendants and their sales agents knew, among other facts described herein, that Plaintiffs and proposed class members were not buying a share in a specific unit but were instead buying into a "floating use plan"; that Plaintiffs and proposed class members would not be able to use a Resort property when desired due to Defendants' artificial restriction of availability.  They failed to adequately disclose these material facts to Plaintiffs, as more fully described herein.

200.    Defendants and their sales agents did this for their own pecuniary benefit, in the form of commissions and increased payments to Defendants.

201.    Defendants' omissions of material fact described herein constituted material inducements to Plaintiffs and proposed class members to purchase timeshare properties, to pay other charges and fees at the time of purchase, to upgrade to purportedly superior properties, and to pay charges and fees during the period of ownership.

202.    Plaintiffs were entitled to rely upon the representations of the Defendants and their sales agents, given the respective position of the parties and the duties owed by real estate licensees and sellers of real property.  Ordinary diligence by Plaintiffs would not have revealed the undisclosed facts.  Plaintiffs and proposed class members were induced to act by the representations of Defendants and their sales agents, and did act, in ignorance of the falsity of the representations and with a reasonable belief that the representations were true. Plaintiffs' reliance was reasonable and justifiable, and caused them to be damaged.

203.    At the time, the statements omitting material facts were made, Defendants and their sales agents knew that they were false.  In short, Defendants and their sales agents deceived the Plaintiffs intentionally and for the purpose of closing the sale, for the benefit of themselves (via their commissions) and for the benefit of Defendants, breaching duties owed to Plaintiffs and proposed class members.

204.    For all these reasons, the Contract should be rescinded, and Defendants should be liable for the damages they have caused Plaintiffs, and for punitive damages.

## COUNT VI-UNCONSCIONABILITY
### (Against all Defendants)

205.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

206.    Plaintiffs and members of the proposed class entered into contracts with Defendants to purchase timeshare properties at the various Resorts.

207.    If a contract is unfair or oppressive to one party in a way that suggests abuses during its formation, a court may find it unconscionable and refuse to enforce it.  A contract is most likely to be found unconscionable if both unfair bargaining and unfair substantive terms are shown.  An absence of meaningful choice by the disadvantaged party is often used to prove unfair bargaining.

208.    Missouri law states in **Section 400.2-302. (1)** *"If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."*

*(2) "When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination."*

209.    There are procedural and substantive aspects to unconscionability.

210.    Procedural unconscionability relates to the formalities of the making of an agreement and encompasses, for instance, fine print clauses, high pressure sales tactics or unequal bargaining positions.

211.    The test for unconscionability as a balancing test or "sliding scale" between the substantive and procedural aspects.

212.    This general rule provides an acceptable analytical framework for most cases because a party who employs procedurally unconscionable bargaining tactics usually does so with the goal of inducing the other party into a one-sided contract.

213.    Nonetheless, there are cases in which a contract provision is sufficiently unfair to warrant a finding of unconscionability on substantive grounds alone.

214.    The contracts the Plaintiffs signed were both procedurally and substantively unconscionable.   Not only the one-sidedness of the contracts, but also the conduct of the Defendants and their agents, and its effects on the Plaintiffs' ability to negotiate with the Defendants, render these contracts unconscionable.

215.    As a result of the Defendants'' unconscionable behavior, the contracts should be rescinded, and Defendants should be liable for the damages they have caused Plaintiffs and proposed class embers, and for punitive damages.

## COUNT VII-CIVIL CONSPIRACY
### (Against all Defendants)

216.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

217.    Defendants agreed to join a conspiracy related to defrauding consumers in the purchase of timeshare properties seemingly, but not actually, in compliance with the law of Missouri.

218.   Each Defendant exercised control over each other Defendant and/or all Defendants were under common control in ways that will be revealed during discovery through the production of evidence that is presently in the exclusive control of Defendants.

219.   The conspiracy had a common design, jointly and knowingly established by Defendants acting through their agents and employees.

220.   Defendants knew that the object of this conspiracy was to market and sell timeshare properties to Plaintiffs and proposed class members, without adequately disclosing, among other material facts described herein, that Plaintiffs and proposed class members were not buying a share in a specific unit but were instead buying into a "floating use plan"; that Plaintiffs and proposed class members would not be able to use a Resort property when desired due to Defendants' artificial restriction of availability; and that Plaintiffs and proposed class members had a right to rescind their timeshare purchase under Tennessee law.  The objects of the conspiracy were fraud, breach of contract, unjust enrichment, negligent misrepresentation, and/or violations of the Missouri Time-Sharing Regulations, as described more fully herein.  Defendants knew that these objects were unlawful and would be accomplished by unlawful means such as fraud, misrepresentations, and omissions.

221.   Defendants had a meeting of the minds on the object of or course of action for this conspiracy.  Defendants knew and agreed upon the unlawful object or course of action for this conspiracy. Defendants also knew that their wrongful actions would inflict injury upon the targets of the conspiracy, including Plaintiffs.

222.   As described above, Defendants committed multiple unlawful and overt acts to further the object or course of action for this conspiracy as described above.

223.    These unlawful acts proximately caused the damages suffered by Plaintiffs. Accordingly, Plaintiffs are entitled to recover their actual damages, plus costs, attorneys' fees, and pre-judgment interest and post-judgment interest.

## PRAYER FOR RELIEF

In light of the foregoing, Plaintiffs respectfully request:

1.    That an injunction be issued declaring that Plaintiffs have a right to rescind the timeshare purchase contracts and that Defendants must disgorge profits received from them; and enjoining Defendants from using folders containing secret pockets, utilizing a "delayed closing" deed delivery system that invites fraud, violating the Missouri Merchandising Practices Act, Missouri Timeshare Regulations, as applicable in each case, continuing to breach the contracts described herein, and specifically from selling timeshare properties while restricting purchasers' ability to use them, failing to disclose that their availability is limited, and failing to disclose that purchasers have a right to rescind their purchase.

2.    Judgment to be entered against all Defendants on all causes of action and damages suffered.

3.    Plaintiffs be awarded the full, fair, and complete recovery for all causes of action and damages suffered.

4.    Plaintiffs be awarded rescission of their timeshare contracts, damages, punitive damages, restitution, attorneys' fees, and costs.

5.    Plaintiffs be awarded all appropriate costs, fees, expenses, and pre-judgment and post-judgment interest, as authorized by law; and such other relief that the Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiffs request a jury trial on all questions of fact raised by this Complaint.


Dated: October 9, 2020


Respectfully submitted,

By:   /s/Timothy S. O'Grady
    Timothy S. O'Grady        #45695
    t.ogrady@consumerlawprotection.com
    Consumer Law Protection Lawyers
    1610 Des Peres Road, Suite 125
    Des Peres, MO 63130
    (314)-686-4630
    *Attorney for Plaintiffs*